Condensed Transcript produced by

AAA Court Reporting Company

Kansas City's Premier Court Reporting Service

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


LIBERTY MUTUAL FIRE
INSURANCE COMPANY,

       Plaintiff,

vs.              Case No. 2:14-cv-02332-CM-JPO

THE CLEMENS COAL COMPANY,
DENNIS WOOLMAN,
and CLAYTON SPENCER,

       Defendants.



       DEPOSITION OF ROBERT BRYAN TILDEN, JR.,
a witness, taken on behalf of Defendant Woolman,
pursuant to Notice, on the 18th day of September,
2015, at the law offices of SEYFERTH BLUMENTHAL &
HARRIS LLC, 4801 Main Street, Suite 310, Kansas
City, Missouri, before

       AVANELLE L. SULLIVAN

for AAA Court Reporting Company, a Registered
Professional Reporter, Certified in Missouri and
Kansas.


          APPEARANCES

    For the Plaintiff:
      MR. BRUCE A. MOOTHART
      SEYFERTH BLUMENTHAL & HARRIS LLC
      4801 Main Street, Suite 310
      Kansas City, Missouri 64112

    For the Defendant Woolman:
      MR. ROBERT O. JESTER
      ENSZ & JESTER, PC
      1100 Main Street, Suite 2121
      Kansas City, Missouri 64105



## AAA COURT REPORTING COMPANY
Kansas City's Premier Court Reporting Service

8001 Conser, Suite 200
Overland Park, KS 66204
(913) 385-2699 · (F) 385-2693

Toll Free (800) 205-7930
www.aaacourtreporters.com
mail@aaacourtreporters.com



EXHIBIT
9

Page 58

coverage for that risk."  Did I read that correctly?

A. Yes, sir.

Q. And custom and practice.  Again, you're using it in a generic sense as in it applies, I assume, to the entire United States.  Is that correct?

A. Actually worldwide.

Q. All right.  So you're not -- you're not saying the custom and practice would apply specifically to Kansas, but you would anticipated it would; is that correct?

A. That's correct.

Q. Does an insurance agent as Debbie Smith have any obligation to review with a potential insured the coverages available to that insured for their particular industry?

A. If asked, yes, sir.

Q. Okay.  And do you know in this case whether or not she was asked?

A. I could not discern that.

Q. And does a commercial insurance agent such as Debbie Smith have an obligation to review potential risk of an industry with that potential insured?

Page 59

A. "Risk" is a broad term.  The insurance agent has the responsibility to respond to the insured's instructions.

Q. Right.  Do they have no responsibility to tell the insured, Well, you have a risk for this potential claim and so you should consider this particular coverage?

A. That is outside of the custom and practice.

Q. In the normal insurance sales area, that's outside the custom and practice?

A. Yes, sir.  Let me give you an example.  Anyone could die yesterday.  Under that hypothetical, I would be required, if a person wanted to procure homeowner's insurance, to also sell them life insurance, also sell them disability insurance, et cetera.  So it's just not done.

Q. But in this particular case, we're not talking about ancillary coverages.  We're talking about a workers' compensation policy being sold to a surface coal mining operation.

Would the agent not have an obligation to consider potential risks for a surface coal mining company in reference to that sale?

A. If asked, yes, sir.

Page 60

Q. Well, what if the insured doesn't have enough knowledge to request or ask?

A. It's custom and practice for the retail agent to follow the insured's instructions.

Q. All right.  So it's not a custom and practice for a retail insurance agent to inquire into the nature of the industry, the business, the number of employees, the nature of the risks exposed to by those employees -- none of that is normal in the industry?

A. In your question you blended exposure base, number of personnel, et cetera, with some dynamic factors.  Setting aside exposure, payroll receipts, number of employees, if the instructions to the agent are to duplicate the coverage, then at that point the agent would follow the insured's instructions and duplicate the coverage they have.

Q. Does the sales agent have an obligation to examine the exposure that that potential insured has and make recommendations based on the exposure?

A. If asked, yes, sir.

Q. All right.  Well, in a surface coal mine operation, if you ask how many workers are

Page 61

involved in the actual surface coal mine operation, would you not have an obligation, then, to indicate to that potential insured that there is exposure under the Federal Coal Mine Health and Safety Act?

A. If asked for that level of service, yes, sir.

Q. Now, you've -- what do you mean by "level of service"?  You're qualifying it.

A. I cannot find anything in the testimony other than the agent testifying that they took the old policies and procured the coverage that was on the old policies.

Q. Okay.  So they exercised no independent thought with reference to what the potential exposures were, then?

A. I could not find in the testimony any testimony about independent thought.

Q. Is that a good practice on the part of a commercial insurance sales agent?

A. You don't sell as much insurance if you follow that practice, but the standard is you follow the insured's instructions.

Q. And, again, if those instructions included a policy with the black lung endorsement, then the failure to provide that would be failure

Page 62

to follow the insured's instructions; correct?

MR. MOOTHART: Object to form and foundation, incomplete hypothetical.

A. In that hypothetical, yes, sir.

Q. (By Mr. Jester) Does a commercial sales agent in respect to tendering a potential policy to an insured have any obligation to make sure the policy as tendered to the insured complies with state statute?

A. The reason I pause is that it's a multipart answer. So let's break it into small parts.

Q. Okay.

A. There are certain statutes such as automobile, financial or compulsory liability where the agent would affirmatively have to explain this is the minimum that you buy. There are certain jurisdictions -- property insurance is an example -- that are valued policy jurisdictions where the agent by statute has a responsibility to determine the value of the instructor. There are many statutes in common law that could apply to an insured, but the agent cannot foresee the actual situation coming up.

Q. And so it's fair for an agent in selling the

Page 63

policy to a surface coal mine to not comply or suggest compliance with Federal statutes?

MR. MOOTHART: Object to form and foundation.

A. I'm not an attorney but my understanding of the black lung statute, the compliance falls with the mine or the individual. If the insured were instructed to procure a policy with or without it, that's the insured's decision.

Q. (By Mr. Jester) And if the past policy tendered by the insured to this particular sales agent, Debbie Smith, contained the black lung endorsement, then the policy sold to the Clemens Coal Company for 1996 to '97 should have contained the black lung endorsement; is that true?

MR. MOOTHART: Object to form, foundation, incomplete hypothetical.

A. In this hypothetical, yes, sir.

Q. (By Mr. Jester) You go on under 4 and B to say, "Determine which insurer(s) to use." That really doesn't have any application here, does it?

A. Other than the IMA spreadsheet where the

Page 64

insured apparently received different premium quotations --

Q. So that --

A. -- so --

Q. I'm sorry.

A. So, no, sir.

Q. So that would be the only factor data that might apply to this subpart?

A. That's correct.

Q. And then you say, "Determine which agent(s) to use."

A. Same answer.

Q. All right. And then you've got, the "insurance agent and underwriter relies on insured to complete applications or otherwise cooperate in the application process."

And are there any facts or data to support the fact that the representatives of the Clemens Coal Company actually completed any applications?

A. With the applications not being produced, I can't determine one way or the other, other than the testimony of the agent that they requested the prior policies and did the submission based on that.

Page 65

Q. And there's no indication that the Clemens Coal Company didn't cooperate with the agent, Debbie Smith, with reference to the coverage in question, is there?

A. That's correct.

Q. And then you've got as an additional subpart that the "insurance agent and underwriter relies on the insured to review the application." Do you have any facts or data to support that?

MR. MOOTHART: Object to form.

A. Other than the testimony that we have from Ms. Smith that she took the prior policies and used that as the basis for filling out the applications, no, sir.

Q. (By Mr. Jester) All right. So the review of the application -- or the submission as Liberty Mutual calls it -- could have been established if they had been signed; correct?

A. That's correct.

Q. But in this case they weren't signed, were they?

A. I do not know --

Q. Okay.

A. -- as respects the workers' comp policy.

Page 86

opinions or choices with reference to coverage, didn't she?

A. That's correct.

Q. I believe she characterized her role on page 64 of her deposition, line 2 -- she was asked, "So, basically, you were the happy face that walked in and said, "Could I sell you some insurance?"

And her answer was, "Yes." Do you remember reading that?

A. Not specifically.

Q. Okay.

MR. MOOTHART: Why are you smirking? That's your characterization.

Q. (By Mr. Jester) All right. Number 7, you indicate, "Based on the responsibilities and actions of both Liberty as the insurance company and insurance agent, and Clemens as the insured, Clemens could not justifiably expected [sic] or relied on Liberty to take affirmative action to procure black lung disease coverage." (Quoted as read.)

I'm not sure I read that correctly but tell me what you meant.

A. I could find no evidence that the black lung

Page 87

was requested, and I could find no evidence that Liberty agreed to do a risk management survey or assume any responsibilities to procure the coverage.

Q. Okay. But you did see a policy from 1994 to '95 that had the black lung coverage on it for Clemens coal, did you not?

MR. MOOTHART: Object to form. Misstates the record.

A. There was a Travelers policy that had an endorsement on it, yes, sir.

Q. (By Mr. Jester) Right. And you did see the -- you told me it wasn't a declaration page. And I don't remember --

A. Information page.

Q. Information page that indicated that The Hartford policy had a significant additional premium charge for occupational disease loading factor, did you not?

A. That's correct. But in the hypotheticals we're dealing with, that assumes that one of those two policies would have been given to the retail agent. I did see a declination in -- I don't recall which file -- that one of the earlier Hartford policies did not have

Page 88

black lung.

Q. Right. But that was many years before 1996; isn't that true?

A. That's correct. But in the hypotheticals we've been dealing with, I don't know which policy the retail agent would have picked up.

Q. All right. But we do know that the retail agent did pick up a past policy. And if we assume that past policy was the immediate past policy, then it could or could not, as far as Hartford is concerned, contain the black lung endorsement?

MR. MOOTHART: Object to form and foundation.

A. In that hypothetical it did have an occupational disease charge, but I cannot ascertain whether it had black lung coverage.

Q. (By Mr. Jester) Is there a duty to exercise care on the part of an agent such as Debbie Smith if she picks up the past policy and copies it and proceeds to duplicate that coverage per the understanding of Clemens Coal? Does she have a duty to exercise care in that process?

A. The responsibility would be to follow the

Page 89

insured's instructions. So if the insured's instructions would be to duplicate the hypothetical policy, yes.

Q. And if it was not duplicated, then she would have breached her duty of care to that insured; is that correct?

MR. MOOTHART: Object to form and foundation, incomplete hypothetical.

A. Assuming that she did not disclose the difference in coverage, yes, sir.

Q. (By Mr. Jester) And we have nothing to indicate that this agent made any disclosures to Clemens Coal with regard to the coverage; correct?

A. Yes, sir. And equally we have no evidence as to the discussion between the insured's CPA and the coverages that he ordered.

Q. So no facts or data to support either position based on what's available to us today in this case?

A. That's correct.

Q. From your review of this discovery to date that you've listed in your report which we've marked as Deposition Exhibit 2, am I correct in believing that there was no in-house

Page 106

as to what a reasonable, prudent and competent person like Debbie Smith would do under the circumstances presented in this case?

MR. JESTER: Objection; that calls for a legal conclusion on the part of this witness. It's up to the judge.

Q. (By Mr. Moothart) You can go ahead and answer.

A. I've sold insurance in this state. I have been teaching in this state for 35 years. I have agencies that are clients of mine in this state. So I'm familiar with agency work in the state of Kansas.

I also have insurance companies that I work with, including those domiciled in Kansas that I consult with and I'm familiar with their practices.

Q. Okay. And there were multiple hypotheticals that were given, and I just want to clear up or clarify some of those.

If an insured approaches an insurance agent and requests a certain kind of coverage, is the insurance company then obligated to provide that insurance no matter what?

A. The insured makes the offer to the insurance

Page 107

company. The insurance company accepts or rejects the offer.

Q. Right.

A. So they're not obligated to procure the coverage unless the statute stipulates otherwise.

Q. Okay. And you would agree that the record as you've reviewed it does not indicate what was given to Debbie Smith by Clemens Coal?

A. That's correct.

Q. And if it was a pol- -- and this -- there were repeated questions about a policy being provided to Debbie Smith. That was actually just -- she testified that that was her practice.

A. That's my recollection, sir.

Q. Okay. And do you believe that that practice is consistent with what a reasonable, prudent and competent person would do under those circumstances?

A. Yes, sir.

Q. All right. But you would agree that we don't know in this case what Clemens Coal actually gave her?

A. That's correct.

Page 108

Q. Okay. And we know that there was certain information that was provided, such as the employee's industry, those types of things. We know that Liberty Mutual received that info.

A. They received some information, yes, sir.

Q. Right. But, again, the source of that info is actually unknown?

A. That's correct.

Q. For example, it could have been provided by IMA?

A. I have no basis of agreeing or disagreeing with that statement.

Q. All right. But as far as where it came from -- and you are aware that IMA was Clemens Coal's and its parent company's broker and is actually still the parent company's broker as of today?

A. Yes, sir. I saw documents in file indicating that even though Liberty wrote the workers' compensation, that IMA continued the directors and officers coverage, I believe, for Clemens.

Q. All right. And then, again, the record indicates from the IMA documents that it appears that Clemens Coal had gone without

Page 109

black lung coverage in the past.

A. I did find policies indicating they did not have black lung coverage, yes, sir.

Q. And, of course, we don't know what the circumstances of that are?

A. That's correct.

Q. And you'd indicated that there were not any facts or data one way or the other as to whether Debbie Smith informed Clemens Coal that Liberty Mutual would not be providing black lung coverage. Do you recall that discussion?

A. Yes, sir.

Q. Okay. But did Debbie Smith -- she did testify that it would have been her practice -- if Liberty Mutual was refusing to provide a requested coverage, her practice would have been to inform the insured of that?

A. Yes, sir.

Q. And Diana Trent testified that if as the underwriter, requested coverage was not going to be placed, that the underwriter would inform the sales agent like Debbie Smith?

A. That's correct.

Q. Okay. Do those practices comply with what a

Page 110

reasonable, prudent and competent person in Debbie Smith and Diana Trent's position would do?

A. Yes, sir.

Q. So would you agree that at least as far as their practice is, there is some evidence that if, in fact, black lung coverage was requested and it was rejected by Liberty Mutual, that Clemens Coal would have been so informed of that?

A. That's what they testified to.

MR. MOOTHART: All right. Nothing further.

REEXAMINATION

BY MR. JESTER:

Q. There's nothing in the record to indicate one way or the other whether either the agent Debbie Smith or the underwriter Diana Trent informed anybody that they were not providing black lung coverage; correct?

A. Other than their statement of their custom and practice, that's correct, sir.

Q. Right. But nothing contained in any of the documents provided by Liberty Mutual Insurance Company would support that statement of notice

Page 111

to the potential insured; correct?

A. Other than the policy, that's correct, sir.

Q. Okay.

MR. JESTER: I have nothing further. Thank you.

MR. MOOTHART: Okay. Nothing further. He will read and sign.

THE COURT REPORTER: E-Tran and exhibits for both of you?

MR. MOOTHART: Yes.

MR. JESTER: E-Tran for me, please.

(The deposition concluded at 12:52 p.m.)

Page 112

RE: Liberty Mutual v The Clemens Coal Company

PG/LN          Correction and Reason for Change

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

                    _____
                        Robert Bryan Tilden

ALS

Page 113

RE: Liberty Mutual v The Clemens Coal Company

_____  I certify that I have read my testimony and request that NO changes be made.

_____  I certify that I have read my testimony and request that the above changes be made.

                    _____
                        Robert Bryan Tilden

                    Subscribed and sworn to before me this _____ day of _____, 20____

                    _____
                        Notary Public
                        State of _____
                        County of _____
                        My commission expires _____

ALS