## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **LIBERTY MUTUAL FIRE** | ) | |
| **INSURANCE COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No. 14-2332-CM** |
| **THE CLEMENS COAL COMPANY, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM AND ORDER

Plaintiff Liberty Mutual Fire Insurance Company ("Liberty Mutual") filed this case seeking a judicial declaration that a 1996–1997 Liberty Mutual workers' compensation and employee liability insurance policy does not cover a black lung disease claim filed by defendant Clayton Spencer, a former employee of defendant The Clemens Coal Company ("Clemens Coal"). Clemens Coal is bankrupt, and has been dismissed from this case. The former president of Clemens Coal, Dennis Woolman, is the remaining active defendant in the case. Woolman filed a counterclaim for negligence against Liberty Mutual and raised a defense of equitable estoppel.

The court conducted a jury trial on Woolman's counterclaim for negligence. At the same time, the court heard evidence relevant to a bench trial on Woolman's equitable estoppel affirmative defense. The court is now prepared to issue its findings of fact and conclusions of law.

### Findings of Fact

**A.    Background**

1.      Clemens Coal operated a coal mine in Pittsburg, Kansas, and filed for Chapter 7 bankruptcy in August 1997.

2. Woolman was President of Clemens Coal in 1996, serving as its last president before the company went bankrupt.

3. Spencer filed a claim on November 19, 2012 with the United States Department of Labor ("DOL") for benefits under the Black Lung Benefits Act (Title IV of the Federal Coal Mine Health and Safety Act of 1969), 30 U.S.C.A. § 901 *et seq.*, against Clemens Coal, seeking damages related to his alleged contraction of black lung disease (the "Spencer Black Lung Claim").

4. Spencer claimed that he contracted black lung disease from exposure to coal dust during his employment with Clemens Coal.

5. On May 16, 2013, the DOL sent Woolman a letter informing him that coal mine operators must maintain insurance coverage for payment of black lung disease benefits, and that an employer who fails to maintain such coverage is subject to penalties. The letter further advised that the president of the coal company is jointly and severally liable for payment of black lung disease benefits.

6. The DOL letter stated that Clemens Coal was uninsured on July 25, 1997, the claimant's last date of employment.

7. On September 13, 2013, Liberty Mutual sent Woolman a reservation of rights letter, stating that coverage was presently undetermined, but that the insurance company would provide him with a legal defense under a full reservation of rights during the investigation.

8. On November 8, 2013, Liberty Mutual sent another letter to Woolman, clarifying that the previous reservation of rights letter pertained only to Clemens Coal—not Woolman personally. Liberty Mutual advised that it would not provide a defense to Woolman and recommended that Woolman retain his own counsel to represent his personal interests.

**B.    The Liberty Mutual Policy**

9.      Liberty Mutual issued a workers' compensation and employer liability policy of insurance (the "Policy") to Clemens Coal with effective dates of November 1, 1996 to November 1, 1997.  The Policy, however, was cancelled on August 1, 1997 due to non-payment.

10.     Part Two of the Policy provides that the insurance does not cover "bodily injury to any person in work subject to . . . the Federal Coal Mine Health and Safety Act of 1969 (30 USC Sections 901–942), any other federal workers or workmen's compensation law or other federal occupational disease law, or any amendments to these laws."  (Exhibit 1, at 5, ¶ C.8.)

11.     The Policy does not contain the Federal Coal Mine Health and Safety Act Coverage Endorsement, which would provide coverage for black lung disease claims.

12.     The parties stipulated before trial that the Policy "as written <u>does not</u> provide coverage for the claim filed by Clayton Spencer with the United States Department of Labor for benefits under the Black Lung Benefits Act (Title IV of the Federal Coal Mine Health and Safety Act of 1969)." (Doc. 119.)

13.     The plain language of the Policy does not provide coverage for the Spencer Black Lung Claim.

C.      **Background Regarding Clemens Coal's Procurement Practices and Needs**

14.     Woolman did not procure insurance for Clemens Coal.  Instead, James Worley, an external consultant, procured workers' compensation insurance for the company.

15.     Worley began procuring insurance for Clemens Coal around 1995.  When procuring insurance for Buildex (Clemens Coal's sister company), he "would do the evaluation of the insurances, look at comparable companies, the coverages, [and the] benefits."  (Worley Trial Dep., at 9:12–14.)

16.     In following his typical process of procuring insurance, Worley testified that he "would have referenced [the IMA] initially."  (*Id.* at 17:10–13.)  The IMA was Clemens Coal's insurance broker.  The IMA typically had three to five prospective carriers for him to compare.

17.    When comparing policies, Worley compared the premiums and the types of coverages that were offered.

18.    The Liberty Mutual policy was the first policy Worley had procured for a coal company directly from an insurance company.

**D.    Clemens Coal's Procurement of the Liberty Mutual Policy**

    **1.    Clemens Coal's Insurance Needs and Prior Insurance Policy**

19.    Woolman did not give Worley any specific instructions regarding what type of coverage Clemens Coal needed.  Instead, Woolman stated "I wanted to be legal like I've always been through the years, and to get the coverage for the employees that was needed, and cover all of our liabilities." (Trial Transcript, at Vol. III, 329:21–24.)  But Woolman "really didn't specifically say anything" to Worley about what coverage was needed.  (*Id.* at 366:14–17.)

20.    Clemens Coal's prior policy was the Hartford policy.  The Hartford policy could not be located.  Woolman did not present any clear evidence showing what coverage the Hartford policy provided, or that the Hartford policy actually included coverage for black lung disease claims.

21.    Instead, a "Change in Information Page" for the Hartford policy was produced, which contained a classification and premium calculation for "occupational disease loading."

22.    Ronald Srajer, IMA's account representative for Clemens Coal, testified that black lung disease coverage would have been included in the "occupational disease loading" classification.  (Trial Transcript, at Vol. I, 58:6–16.)  But Gerald Haake, Woolman's expert, testified that there is no way of determining whether the Hartford policy contained the black lung endorsement simply by looking at the "Change in Information Page."

23.    The Hartford sent Clemens Coal a reservation of rights letter in January 1996, in connection with a previous black lung disease claim.  That letter provided, "We have been unable to date to confirm any coverage for your alleged Federal Black Lung Exposure . . . ."  (Exhibit 8.)  The

letter further provided that "In order for us to handle this matter . . . we must have the proper Federal Coal Mine Health & Safety Act Endorsement to apply to your policy." (*Id.*)

24.     Based on this evidence, the court finds that it is unclear whether the Hartford policy contained an endorsement for black lung disease coverage.

### 2.     The Transaction between Worley and Smith

25.     Worley procured the Liberty Mutual policy through Deborah Smith, Liberty Mutual's agent.

26.     Smith did not recall the circumstances of the sale of insurance to Clemens Coal.

27.     The Liberty Mutual policy was the first insurance that Smith sold to a coal company. She was unaware of the Federal Coal Mine Health and Safety Act of 1969.

28.     Consistent with her typical procedure in selling insurance, Smith would not have analyzed what types of exposure a potential customer might have.  Smith would ask the clients what coverage they needed.  It varied how she obtained that information from the clients.  She said that she was not in a position to tell them what they needed.

### 3.     Duplication of Prior Policy

29.     Smith stated that obtaining a copy of the business's prior policy was one of the ways to determine coverage for a particular business.  She explained that she would have only copied Clemens Coal's prior policy if Worley had given her the policy.  But Smith had no recollection as to whether Worley provided her with a copy of any prior policies and stated that she did not think that she was provided with a prior policy.

30.     Worley did not remember giving copies of prior policies to Liberty Mutual agents.

31.     Smith testified that all of the information she needed could have been obtained from other sources, and that using other sources was not uncommon.  On a regular basis, she issued package polices like the one issued to Clemens Coal without receiving a prior policy.

32.     When asked why she did not include the black lung endorsement if she had access to a prior policy, Smith testified credibly that, "I don't recall ever seeing that.  I can't say I got a copy of the policy."  (Trial Transcript, at Vol. II, 138:20–21.)

33.     Diana Trent, Liberty Mutual's underwriter of the Policy, testified credibly that she would not have received a copy of any of Clemens Coal's prior policies.

34.     The court finds that Clemens Coal did not prove that Worley provided Smith with a prior policy for Clemens Coal.

35.     Furthermore, the court finds that there is no evidence or testimony that Clemens Coal requested, and Smith agreed, that such prior policy be duplicated for coverage purposes.

**4.      Coverage Request by Clemens Coal**

36.     Smith relied on the insured to tell her what they needed.

37.     Worley did not remember any discussions with Smith and did not remember if any agent from Liberty Mutual ever asked if Clemens Coal needed black lung disease coverage.

38.     Smith would not have asked Clemens Coal about specific potential exposures such as black lung disease.  Instead, she would have just asked what coverages to include in the quote.

39.     Smith stated that if someone asked about a certain coverage, she would ask underwriting about it.  But she didn't remember black lung coverage coming up.  No evidence was presented that Smith asked underwriting about a black lung disease endorsement.

40.     Worley did not remember specifically requesting black lung disease coverage from Liberty Mutual.  He merely assumed it was included.

41.     Trent had been working as an underwriter with Liberty Mutual for eight years when the Policy was issued to Clemens Coal.  Although she was unaware of the Federal Coal Mine Health and Safety Act endorsement in 1996, Trent had experience in writing policies that included other federal occupational disease endorsements.

42.     Trent stated that when she receives a submission form, she presumes that the agent has provided her with the information of what coverage the potential insured had requested.  If she was not given a particular endorsement to add to the policy, she did not add such an endorsement.  And she would not have suggested to the agent that an endorsement might be necessary.

43.     The court finds that no one from Clemens Coal requested the endorsement for black lung disease coverage.

**5.     Liberty Mutual's Representations or Acts of Coverage**

44.     Smith did not affirmatively offer or represent that black lung disease coverage would be included in the Policy.  Smith was unaware that an endorsement existed for such coverage, and had never even heard of the term "black lung" as an occupational disease in 1996.

**6.     Woolman's Reliance**

45.     In January 1996, Clemens Coal received the previously-mentioned letter from The Hartford about a black lung disease claim.  On January 23, 1996, in response to The Hartford's letter, David Gilbreth, a controller and risk manager for Clemens Coal, asked for clarification regarding black lung disease coverage, stating, "Would it be part of the policy as an endorsement?"  (Exhibit 9).

46.     Representatives of Clemens Coal therefore had actual notice that black lung disease coverage required that the policy include a Federal Coal Mine Health & Safety Act endorsement.

47.     In addition, Worley testified that he knew that the policy would need to have black lung disease coverage and that he did not need a Liberty Mutual agent to inform him of that fact.

48.     The court finds that Worley did not rely on any representations or acts of Smith to form a belief that black lung disease was covered under the Policy.

49.     Furthermore, Worley knew that the Liberty Mutual policy was $43,000 cheaper than purchasing a workers' compensation policy through the IMA.

50.     Worley assumed that the Liberty Mutual policy was cheaper because it was not in the assigned risk pool.  But he did not remember doing any additional inquiry about the price difference.

51.     Worley's assumption was undermined by his own acknowledgment that the premiums for the assigned risk policy that he procured for Buildex that same year were actually $2,000 cheaper than that offered by Liberty Mutual.

52.     Srajer acted as an IMA account representative for Clemens Coal from the early 1990's and provided them with assigned risk policies until 1996.  Srajer also acted as the account representative for Buildex.

53.     When asked whether he remembers advising Clemens Coal that the Liberty Mutual policy might be less expensive because it provided different coverage, Srajer testified, "I'm sure that came up, 'cause whenever we had the opportunity, you know, we would go back and try to give our opinion about differences, and that kind of premium difference would mean that there's something different . . . ."  (Trial Transcript, at Vol. I, 75:8–15.)

54.     Srajer testified credibly that he would have notified Clemens Coal that the Liberty Mutual policy may provide different coverage in light of the significant difference in price.

55.     Srajer confirmed that The Hartford had informed Clemens Coal by letter in January 1996 that an endorsement is required for black lung disease coverage.  Srajer remembered having a conversation with representatives of Clemens Coal in connection with that letter.

56.     When asked whether he remembered having a discussion with Clemens Coal explaining that an endorsement was required, Srajer stated, "I'm sure we had it, but I can't recall."  (*Id.* at 82:5–16.)

57.     The court finds that Srajer's testimony and the other evidence cited above, establishes that representatives of Clemens Coal were aware in January 1996—only a few months before

procuring the Liberty Mutual policy—that an endorsement to a workers' compensation policy must be purchased in order for that policy to provide coverage for black lung disease claims.

58.     The black lung disease endorsement was not included in the Liberty Mutual policy's Endorsement Schedule List.  Srajer testified that if he saw that the endorsement was not included on this list, he would "absolutely" investigate and would "read the policy in totality . . . to see if [the endorsement] was attached or not."  (*Id.* at 88:9–12.)

59.     The court finds that based on (1) the January 1996 letter from the Hartford to Clemens Coal, (2) Srajer's discussions with Clemens Coal in connection with that letter, and (3) Srajer's discussion with Clemens Coal advising them to ensure that the Liberty Mutual policy provided the same coverage in light of the significant price difference between the policies, Clemens Coal had actual notice that the policies were not identical and should have examined the Liberty Mutual policy.

60.     Worley did not read the Policy.  Instead, he would have looked for summaries.  He "always assumed that the policy would include what was required."  (Worley Trial Dep., at 38:16–17.)

61.     Worley understood that black lung disease was a federal workers' compensation requirement.  Had he read the Policy, he would have understood it had limitations.  Had he reviewed the Policy's first page, he would have known that it did not cover federal occupational disease claims.

62.     Woolman shared Worley's assumptions, as he testified that "[f]rom my recollection, I would say that I – I figured it was the same as the ones we'd had previously."  (Trial Transcript, at Vol. III, 335:20–21.)

63.     If anyone from Clemens Coal had read the Policy, they would have become aware that black lung claims were not covered by the Policy.

## CONCLUSIONS OF LAW

### I.      Liberty Mutual's Declaratory Judgment Claim

64.      Liberty Mutual brought this lawsuit to obtain a declaration from the court that the Policy does not provide coverage for the Spencer Black Lung Claim.

65.      The interpretation of an insurance policy is a question of law for the court.  *Davis v. Allstate Ins. Co.*, 143 P.3d 413, 416 (Kan. Ct. App. 2006).  "Where the language of the contract is clear and can be carried out as written, there is no room for construction or modification of its terms."  *Steinle v. Knowles*, 961 P.2d 1228, 1233 (Kan. 1998) (citation omitted).

66.      As previously noted, the parties stipulated before trial that the Policy "as written <u>does not</u> provide coverage for the claim filed by Clayton Spencer with the United States Department of Labor for benefits under the Black Lung Benefits Act (Title IV of the Federal Coal Mine Health and Safety Act of 1969)."  (Doc. 119.)

67.      Due to the limiting language in Part Two of the Policy, the only way for Clemens Coal to obtain black lung coverage was by purchasing the Federal Coal Mine Health & Safety Act Endorsement.  But the Policy contained no such endorsement and Clemens Coal did not pay for it.

68.      The court concludes that the plain language of the Policy is unambiguous and does not provide coverage for the Spencer Black Lung Claim.

### II.     Woolman's Estoppel Claim

69.      Woolman seeks to prevent Liberty Mutual from denying coverage through theories of equitable estoppel and/or promissory estoppel.

70.      "A party seeking to invoke equitable estoppel must show that the acts, representations, admissions, or silence of another party (when it had a duty to speak) induced the first party to believe certain facts existed."  *Gillespie v. Seymour*, 823 P.2d 782, 788–89 (Kan. 1991).  "There must also be a

showing the first party rightfully relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts." *Id.*  In other words, "[t]he doctrine of equitable estoppel has two fundamental elements: misrepresentation and detrimental reliance." *United Cities Gas Co. v. Brock Expl. Co.*, 995 F. Supp. 1284, 1297 (D. Kan. 1998) (citing *Cosgrove v. Young*, 642 P.2d 75, 85 (Kan. 1982)).

71.      To succeed on a claim of promissory estoppel, a party must show: "(1) the promisor reasonably intended or expected the promisee to act in reliance on the promise; (2) the promisee acted reasonably in reliance on that promise; and (3) a refusal of the court to enforce the promise would sanction the perpetration of fraud or result in other injustice." *W&W Steel, LLC v. BSC Steel, Inc.*, 994 F. Supp. 2d 1066, 1078 (D. Kan. 2013) (citing *Ayalla v. Southridge Presbyterian Church*, 152 P.3d 670, 677 (Kan. Ct. App. 2007)).

72.      Estoppel does not apply if "any essential element thereof is lacking or is not satisfactorily proved." *Ram Co. v. Estate of Kobbeman*, 696 P.2d 936, 944 (Kan. 1985) (citation omitted).  And "[e]stoppel will not be deemed to arise from facts which are ambiguous and subject to more than one construction." *Gillespie v. Seymour*, 823 P.2d 782, 789 (Kan. 1991) (citation omitted).

A.      **Expansion of Coverage by Estoppel**

73.      The court first considers whether estoppel can even apply under Kansas law. *Cont'l Cas. Co. v. Multiservice Corp.*, No. 06-2256-CM, 2009 WL 1788421, at *3 (D. Kan. June 23, 2009).

74.      "It is a general rule, acknowledged in this jurisdiction, that waiver and estoppel may be invoked to forestall the forfeiture of an insurance contract but they cannot be used to expand coverage." *Becker v. Bar Plan Mut. Ins. Co.*, No. 113,291, 2015 WL 9459771, at *11 (Kan. Ct. App. Dec. 23, 2015).  Courts will not use estoppel to expand coverage beyond the plain terms of the policy because to do so will "create coverage where none has been contracted for." *Id.*  Accordingly, a central issue in the case is the nature of the provision at issue—"whether it [is] a contractual condition

for payment on a covered occurrence, or whether it limited or excluded coverage in the first instance." *Russell v. Farmers Ins. Co., Inc.*, 163 P.3d 1266, 1268 (Kan. Ct. App. 2007). "The distinction is critical because an insured's failure to comply with a policy condition may be waived, but generally waiver and estoppel will not expand a policy's coverage." *Id.*

75.     Although the Kansas Court of Appeals has repeatedly stated this rule, the Kansas Supreme Court applied estoppel to impose liability beyond the terms of an insurance policy in *Heinson v. Porter*, 772 P.2d 778 (Kan. 1989), *overruled on other grounds by Glenn v. Fleming*, 799 P.2d 79 (Kan. 1990). But *Heinson* applies only where (1) there were affirmative representations and acts of coverage; and (2) the policy did not explicitly exclude coverage. *Russell*, 163 P.3d at 1269.

1.     **Affirmative Representations and Acts**

76.     Woolman presented no evidence of an affirmative representation made by Liberty Mutual. Unlike *Heinson*, where the agent told the insured that her day care business would be covered under the policy, 772 P.2d at 783, no evidence was presented that Smith affirmatively represented to Clemens Coal (or Woolman) that the Policy would cover black lung disease claims.

77.     Woolman failed to present evidence that Smith had Clemens Coal's prior policy or that she copied any documents. In fact, Smith testified that copying a prior policy was only one way of obtaining the necessary information for issuing a policy and that it was not her job to duplicate coverages. There was no evidence that Worley saw Smith copy a prior policy that Smith told Worley that she planned to do so. And there was no evidence that Smith's alleged act of copying a policy was ever relayed to Woolman.

78.     Silence is not the same as an affirmative representation. *See McCloud v. Bd. of Geary Cty. Comm'rs*, No. 06-1002-MLB, 2008 WL 3502436, at *2 n.2 (D. Kan. Aug. 11, 2008) (finding that requests for admissions distinguishing between statements that were made and statements that were not made was "more factually precise, and distinguishes between affirmative representations and silence");

*see also Duvvur v. Freeman*, No. 99,332, 2009 WL 1530800, at *5 (Kan. Ct. App. May 29, 2009) (distinguishing between fraud by affirmative misrepresentation and fraud by silence).  Additionally, assuring someone that a particular workers' compensation policy generally covers "the operations of a coal company" is not an affirmative representation that the policy specifically covers black lung disease claims.

79.     *Heinson* does not apply to this case because there were no affirmative representations or acts of coverage here.  Without these, Woolman may not invoke estoppel to expand coverage.

**2.        Explicit Exclusion of Coverage**

80.     Even if Woolman had shown an affirmative representation or act of coverage, *Heinson* only applies where the policy does not explicitly exclude coverage.  *See Russell*, 163 P.3d at 1269.

81.     The parties stipulated before trial that the Policy, as written, does not provide coverage for the Spencer Black Lung Claim.

82.     Parties are bound by stipulations made by them or their attorneys unless those stipulations are withdrawn by the court.  *See C.M. Showroom, Inc. v. Boes*, 933 P.2d 793, 795–96 (Kan. Ct. App. 1997).

83.     The court concludes that the unambiguous language of the Policy explicitly excludes coverage for black lung disease claims.  Coverage for such claims would only exist if the Policy included the Federal Coal Mine Health and Safety Act endorsement.  Additionally, Worley knew that black lung disease was subject to federal workers' compensation law.  Under the Policy's unambiguous language, bodily injury subject to both the Federal Coal Mine Health and Safety Act and federal workers' compensation law was explicitly excluded under the Policy.

84.     Woolman claims that Liberty Mutual can nevertheless be estopped from denying coverage because the formation of the policy is in question.

85.   Woolman's contention is contrary to the *Heinson* court's application of estoppel.  In *Heinson*, the court stated "there are really two areas for application of the doctrine of estoppel—[the insurance company]'s actions prior to issuance of the policy, and its actions after the [injury]."  772 P.2d 783.  The court criticized the trial court for focusing its analysis solely on pre-issuance conduct of the insurance company.  *Id.*  Instead, the court made clear that "the totality of the circumstances must be considered."  *Id.*

86.   Accordingly, the court concludes that the appropriateness of the insurance company's handling of the claim after the injury must be considered—not just the formation of the policy as Woolman contends.  *See id.*

87.   Because the court has already concluded that the Policy explicitly excludes coverage for the Spencer Black Lung Claim, estoppel does not apply under *Heinson*.

### 3.   *Heinson* Factors

88.   Even if *Heinson* applied, the facts of this case are distinguishable.

89.   In *Heinson*, a homeowner's policy excluded coverage for bodily injury arising from "business pursuits."  *Id.* at 780.  The insured operated an in-home day care center.  *Id.*  A child for whom she was caring fell from a highchair and suffered serious head injuries.  *Id.*  After several months of changing its position as to whether the policy covered the injury, the insurer ultimately relied on the "business pursuits" exclusion to deny coverage for the claim.  *Id.* at 780–81.

90.   The *Heinson* court estopped the insurer from denying coverage for the claim based on the following factors: (1) the insurer knew the insured was operating a day care business; (2) the insurer's agent told her the policy would cover the day care; (3) the application for insurance included the day care activity; (4) after the application was completed, the insurer was sufficiently concerned to call the insured to obtain the full particulars of the business operation; (5) the insurer issued the policy with reluctance not expressed to the insured; (6) no specific language was included in the policy

excluding the day care business; (7) after the injury, the insurer sent a "long series of conflicting and confusing" reservation of rights letters; (8) much of the time, the insurer believed the injury was covered under the policy; and (9) the insurer had "many internal concerns after the loss that it had gone too far to deny coverage." *Id.* at 783.

91.     A brief review of each factor demonstrates why *Heinson* is inapplicable.

92.     First: Woolman claims that because Liberty Mutual knew Clemens Coal operated a coal mine, it necessarily proposed insurance that provided appropriate coverage.  The insurance company in *Heinson* knew the insured was operating a day care business, but sought to exclude all injuries arising out of "business pursuits"—effectively excluding coverage for anything arising out of operation of the day care business.  *Id.*  Unlike the insurance company in *Heinson*, however, Liberty Mutual did not seek to exclude coverage for all injuries that arise generally out of coal mine operations.  The Policy provides coverage for injuries arising from the operation of a coal mine, excluding only certain, specifically-delineated types of claims.

93.     Second: The insurance agent in *Heinson* affirmatively represented to the insured that the day care business was already covered under the policy when the insured inquired about purchasing such additional coverage.  *Id.* at 780.  Here, no evidence was presented that Clemens Coal inquired about purchasing additional coverage for black lung disease claims or that Smith told them that the Policy already included such coverage.  In fact, the parties had no memory of discussing black lung disease coverage.  And the mere act of issuing a workers' compensation policy to a known coal company is not an affirmative representation that the Policy included black lung disease coverage.

94.     Third: The day care business was listed on the insurance application in *Heinson*, further evidencing the fact that the insurance company knew the insured needed coverage for that business.  *Id.* at 783.  Here, there is no insurance application available to review.

95.     Fourth: The insurance company in *Heinson* was "sufficiently concerned" regarding the insured's day care business to call her to request "the full particulars of the business operation."  *Id.* Here, there is no evidence that Liberty Mutual sought more information from Clemens Coal regarding its operations.  There also was no evidence that Liberty Mutual was "sufficiently concerned" that Clemens Coal was susceptible to black lung disease claims to inquire as to the frequency of such claims.

96.     Fifth: The insurance company in *Heinson* had "some doubts about issuing the policy" after calling the insured to get more information as to the day care business.  *Id.* at 780.  Here, no evidence was presented to suggest that Liberty Mutual had doubts about issuing the policy.

97.     Sixth: The *Heinson* court considered whether the policy contained specific language excluding the day care activity.  *Id.* at 783.  The provision in *Heinson* excluded bodily injury arising out of "business pursuits."  *Id.* at 780.  The *Heinson* court noted that the provision did not specifically exclude injury arising out of the operation of a day care, for which the agent had explicitly told the insured would be covered.  *Id.* at 783.  This case would be more like *Heinson* had Liberty Mutual similarly attempted to exclude coverage for injury arising out of "business pursuits" or "coal mining operations."  However, the court has already determined that the exclusion unambiguously precludes coverage for black lung disease claims.

98.     Seventh: The *Heinson* court noted that the insurance company had sent "a long series of conflicting and confusing reservation of rights letters."  *Id.*  There, the insurance company had significantly changed its position regarding coverage throughout the claims handling process.  Unlike in *Heinson*, no evidence was presented that Liberty Mutual ever changed either its coverage position or the basis for denying such coverage.

99. Eighth: The insurance company in *Heinson* believed the injury was covered under the policy for much of the time. *Id.* Here, no evidence was presented that Liberty Mutual ever believed that the Spencer Black Lung Claim was covered under the Policy.

100. Finally: The ninth *Heinson* factor is inapplicable here. No evidence was presented that Liberty Mutual had "internal concerns after the loss that it had gone too far to deny coverage." *See id.*

101. The court concludes that because none of the factors that supported an application of estoppel in *Heinson* are present here, application of estoppel is inappropriate in this case.

**B.     Reasonableness of Any Reliance**

102. Even assuming that an estoppel theory could apply, Woolman's estoppel claim fails because he has not met an essential element of his claim: the reasonableness of any reliance.

**1.   Duty to Read the Insurance Policy**

103. Woolman claims that he was justified in relying on Smith's alleged representations and promises. To support that contention, Woolman relies on *Stewart v. Commonwealth Cas. Co. of Philadelphia, Pennsylvania*, 22 P.2d 435, 437 (Kan. 1933), for the proposition that an insured is not required to read its insurance policy, but may instead assume that the agent prepared the insurance application according to the parties' agreement.

104. Woolman's reliance on this authority is misplaced, as it merely states the exception to the general rule that an insured has a duty to read the insurance policy.

105. Under general principles of contract law, "[a] party to a contract has a duty to learn the contents of a written contract before signing it." *Marshall v. Kan. Med. Mut. Ins. Co.*, 73 P.3d 120, 129 (Kan. 2003). A party's failure to read the contract "estops the party from avoiding the terms of the contract on the grounds of ignorance of its contents." *Id.*

106.    These general principles of contract law equally extend to insurance policies, as "Kansas recognizes some obligation on the insured to review and understand an insurance policy." *Jones v. Reliable Sec. Incorporation, Inc.*, 28 P.3d 1051, 1062 (Kan. Ct. App. 2001).

107.    "Moreover, a party seeking equitable relief must take reasonable action to protect his own interests.  Generally, equity aids the vigilant and not those who slumber on their rights.  A vigilant insured paying significant premiums should be expected to obtain and read a copy of the policy . . . ." *Id.* (citations omitted); *see also McNally v. State Farm Fire & Cas. Co.*, 446 F. Supp. 2d 1192, 1202–03 (D. Kan. 2005) (holding that the plaintiff could not avoid summary judgment where he was ignorant of the coverage provided under a policy "which he failed to read or specifically discuss with his agent for approximately ten years before his motorcycle accident").

108.    Courts will make an exception to this rule for "fraud, undue influence, or mutual mistake."  *Chism v. Protective Life Ins. Co.*, 234 P.3d 780, 790 (Kan. 2010) ("[A]n insurance applicant has a duty to understand the contents of a policy application before signing it absent fraud, undue influence, or mutual mistake.") (citations and quotations omitted); *Hermelink v. Dynamex Operations E., Inc.*, 109 F. Supp. 2d 1299, 1305 (D. Kan. 2000) ("[L]iability on written instruments may be avoided, or such written instruments may be reformed and enforced in accordance with an antecedent oral agreement, when it is made to appear that the party executing the written agreement without reading the same was deceptively or fraudulently induced to believe that the written agreement contained all the terms and conditions of the antecedent oral agreement.").

109.    *Stewart*, the case on which Woolman relies, merely provides an example of this exception.  In that case, the agent knowingly made false representations to the insured regarding the scope of the policy's coverage in an effort to make a sale.  *Stewart*, 22 P.2d at 435–46.  The court stated that an insured "may assume that the agent has prepared the application according to agreement,

-18-

and that the company has written the policy according to the application . . . ." *Id.* at 437 (citation omitted).

110.    Here, there is no evidence that Smith engaged in any fraudulent misrepresentations or exercised undue influence in connection with the procurement of insurance.  Furthermore, there is no evidence that a mutual mistake occurred.

111.    Woolman presented no evidence that Smith failed to prepare the application "according to agreement" as in *Stewart*.  Worley never asked Smith about black lung disease coverage, and Smith was unaware that such coverage existed.  Smith's silence, therefore, could not have been fraudulent.

112.    The court concludes that Clemens Coal had a duty to read and understand the Policy.

### 2.  Failure to Read the Policy

113.    In its Findings of Fact, the court found that no one at Clemens Coal (including Woolman) read the Policy.  Such failure to read the Policy "prevented their reliance on the agent's actions."  *Chism*, 234 P.3d at 790.

114.    The court further concludes that, to the extent that Woolman actually relied on Smith's alleged acts or representations in forming his belief that coverage was afforded under the Policy, such reliance was not reasonable or rightful.

115.    Srajer testified credibly that because of the Policy's price, he would have warned Clemens Coal that the polices may provide different coverages.  This shows that Clemens Coal had actual notice that the policies were not identical.

116.    Because of this actual notice, Clemens Coal could not have reasonably or rightfully relied on Smith's alleged silence or actions to conclude that the policies were identical.

117.    This court has already concluded that the Policy unambiguously precludes coverage for black lung claims.

118.    Consequently, the court concludes that had Woolman, Worley, or anyone else at Clemens Coal read the Policy, they would have learned that the Policy unambiguously precluded coverage for the Spencer Black Lung Claim.  *See McNally*, 446 F. Supp. 2d at 1203 (finding that plaintiff's own ignorance of the unambiguous terms of an insurance policy was insufficient to avoid summary judgment).

119.    In *McNally*, the court found it significant that the insured never read his policies despite being "an educated, experienced businessman."  446 F. Supp. 2d at 1193–94.  The court is mindful that Woolman has served as president of at least two separate companies for multiple years, and has significant business experience.

120.    Based on this evidence, the court concludes that Woolman should reasonably be expected to read and understand the contents of an insurance policy procured for his business.

121.    Furthermore, Woolman knew that black lung disease coverage was required when the Policy was procured in 1996.

122.    Accordingly, the court concludes that, to the extent that Clemens Coal actually relied on any of Smith's alleged representations, acts, or silence suggesting that the Policy contained black lung disease coverage, such reliance was not rightful or reasonable.

123.    Because Woolman failed to show that he reasonably relied on any acts, representations, or silence, his estoppel claim fails.

**C.    Reformation under 20 CFR § 726.204**

124.    Finally, Woolman claims that federal law requires that all insurance contracts for coal companies provide coverage for benefits under the Federal Coal Mine Health and Safety Act, and that if the policy does not provide such coverage, it should be read into the contract.  Woolman relies on 20 C.F.R. § 726.204.

125.    20 C.F.R. § 726.204 provides:

> [E]ach policy or contract of insurance obtained to comply with the requirements of [the Federal Coal Mine Health and Safety Act] must contain or shall be construed to contain –
>
> (a) A provision to pay benefits required under section 422 of the Act, notwithstanding the provisions of the State workmen's compensation law which may provide for lesser payments; and,
>
> (b) A provision that insolvency or bankruptcy of the operator or discharge therein (or both) shall not relieve the carrier from liability for such payments.

126.    Woolman claims that because Worley intended to obtain coverage for black lung disease claims, the Policy was "obtained to comply" with the Federal Coal Mine Health and Safety Act.

127.    Although the regulation may require a coal mine operator to obtain black lung disease coverage, it does not impose a separate and independent duty on an insurer to include such provisions in every insurance policy that might be issued to a coal company.

128.    The language of 20 C.F.R. § 726.1 makes clear that the obligation is on the operator, not the insurer:

> [T]he Federal Coal Mine Health and Safety Act . . . requires each coal mine operator who is operating or has operated a coal mine . . . to secure the payment of benefits for which he may be found liable under section 422 of the Act and the provisions of this subchapter by either: (a) Qualifying as a self-insurer, or (b) By subscribing to and maintaining in force a commercial insurance contract (including a policy or contract procured from a State agency).

129.    20 C.F.R. § 726.2, "Purpose and scope of this part," further provides: "This part provides rules directing and controlling the circumstances under which a coal mine operator shall fulfill his insurance obligations under the Act."

130.    Finally, the basis of Woolman's counterclaim is that he is potentially personally liable for the penalty set out in Part D of the Act.  Part D places responsibility with the operator.  20 C.F.R.

§ 726.300 ("Any operator which is required to secure the payment of benefits under section 423 of the Act and § 726.4 and which fails to secure such benefits, shall be subject to a civil penalty . . . .").

131.    The court concludes that the federal regulations do not shift the burden or penalty to the insurance company to ensure that each policy issued contains black lung disease coverage. Woolman's interpretation would require the court to read into the regulation language providing that "no insurance policy shall issue to a coal mine operator without the required black lung coverage." But the Act places the burden on the operator to obtain the necessary black lung disease coverage—not the insurer.

## III.   **Conclusion**

132.    The plain language of the Policy, as written, unambiguously does not provide coverage for the Spencer Black Lung Claim.

133.    Woolman's estoppel defense fails because estoppel may not be used to expand coverage beyond the terms of an insurance policy and, in any event, Woolman failed to establish essential elements of promissory or equitable estoppel.

**IT IS THEREFORE ORDERED** that Judgment is entered in favor of Plaintiff Liberty Mutual Fire Insurance Company and against Defendant Dennis Woolman on Liberty Mutual's claim for declaratory judgment and on Woolman's estoppel defense.

Dated this 30th day of March, 2017, at Kansas City, Kansas.

**s/ Carlos Murguia**
**CARLOS MURGUIA**
**United States District Judge**